United States District Court
Southern District of Texas
**ENTERED**
August 06, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| YELLOWSTONE LANDSCAPE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-1778 |
| | § | |
| JESUS "TONY" FUENTES, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court in this lawsuit to enforce restrictive covenants is Plaintiff Yellowstone Landscape's ("Plaintiff's") Request for Preliminary Injunction ("Motion") [Doc. # 27]. Defendant Jesus "Tony" Fuentes ("Defendant") responded.[1] The Court held an evidentiary hearing by video on August 3, 2020[2] and the Motion is ripe for decision. Based on the parties' briefing, the evidence of record, and relevant legal authorities, the Court **denies** Plaintiff's Motion.

## I.  BACKGROUND

Plaintiff is a commercial landscape company that designs, installs, and maintains landscaping for commercial and public entities.[3] Harris County Flood

---

[1]  Defendant's Preliminary Injunction Brief [Doc. # 28].

[2]  *See* August 3, 2020 Minute Entry Order [Doc. # 35].

[3]  Plaintiff's Verified Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction ("Complaint") ¶ 6.

Control District ("HCFC") is one of Plaintiff's largest customers in the Houston area.[4]  In Fall 2019, several of HCFC's contracts for the mowing and maintenance of flood control channels in Houston ("wide area mowing") were re-bid.[5]  Plaintiff had the existing contract for the wide area mowing of a flood control channel in Central Northwest Harris County (the "Central NW Contract").[6]

Defendant at that time was an "Account Manager" employed by Plaintiff.  He was the supervisor responsible for overseeing Plaintiff's work performed under the Central NW Contract.[7]  Defendant interacted with the HCFC inspector responsible for the Central NW Contract to ensure the work was being performed in compliance with the contract's specifications.  Defendant was also responsible for tracking the progress of work on the Central NW Contract to ensure the work was performed on time and within budget.[8]  Defendant was not involved in preparing or submitting

---

[4]     *Id.* ¶ 10.

[5]     *See* Harris County Purchasing Agent Bid Tabulations [Doc. # 31-1].

[6]     *Id.* at 15-16.

[7]     Complaint ¶ 10, Defendant Jesus "Tony" Fuentes's Answer to Plaintiff's Verified Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction ("Answer") ¶ 1.10; July 30, 2020 Deposition of Jonathan Edwards [Doc. # 29] ("Edwards Dep.") at 30:2-9.

[8]     *See* Edwards Dep. at 15:22-16:7.

bids for the Central NW Contract or any of Plaintiff's other wide area mowing contracts.[9]

During the re-bidding process, Plaintiff and two other companies submitted bids for the Central NW Contract.[10]   Ferrovial Services ("Ferrovial"), one of Plaintiff's competitors and a new entrant in the Houston region wide area mowing market, submitted the lowest bid and won the contract.[11]   Plaintiff's bid for the Central NW Contract was the highest — over $100,000 more than Ferrovial's bid.[12]   In that round of bidding, Ferrovial also won a second contract for the wide area mowing of a flood control channel in Northwest Harris County (the "Northwest Contract").[13]   The Northwest Contract was previously held by P Ville, another

---

[9]   Defendant testified at the August 3, 2020 evidentiary hearing that he assisted in the preparation of a bid for a tree trimming contract for Texas Department of Transportation.  There is no evidence he otherwise was involved in preparing or submitting bids for Plaintiff.

[10]   Harris County Purchasing Agent Bid Tabulations, Central Northwest Region [Doc. # 31-1] at 15-16.

[11]   *Id.*; *see also* Edwards Dep. at 9:18-24.

[12]   Harris County Purchasing Agent Bid Tabulations, Central Northwest Region [Doc. # 31-1] at 15-16.

[13]   *Id.* at 19-20; *see also* Edwards Dep. at 9:25-10:1.  The evidence reveals that three HCFC wide area mowing contracts were up for bid in Fall 2019 (Central NW, Northwest, and Northeast).  *See*  Harris County Purchasing Agent Bid Tabulations, Central Northwest Region [Doc. # 31-1] at 15-20.  Yellowstone did not bid on the NW Contract.  *Id.* at 19-20.  Yellowstone bid on the Northeast Contract and was the highest of three bidders.  *Id.* at 17-18.

3

landscaping company.[14]  The Central NW Contract and the Northwest Contract are the only two contracts Ferrovial has in Houston, and HCFC is Ferrovial's only Houston area customer.[15]

In March 2020, Defendant, while an Account Manager for Plaintiff, interviewed with Ferrovial for a position as a Superintendent.[16]  During the interview process, Defendant and Ferrovial only revealed general information to each other: Ferrovial told Defendant that the Superintendent would be responsible for overseeing the wide area mowing of flood control channels, but did not name the customer (HCFC) or the specific contract (the Northwest Contract).[17]  Defendant told Ferrovial that he worked for Yellowstone and performed work on flood control channels for HCFC, but did not name the contract he was working on.[18]  Ferrovial offered Defendant the Superintendent position because he had experience mowing flood control channels, which are generally sloped, filled with tall grass, difficult to mow, and considered a type of "specialty mowing."[19]

---

[14]     Edwards Dep. at 9:25-10:1.

[15]     *Id.* at 8:16-9:17.

[16]     *Id.* at 16:18-24; 24:5-25:16.

[17]     *Id.* at 18:8-21.

[18]     *Id.* at 18:8-19:10; 25:20-27:5.

[19]     *Id.* at 20:13-21:23.

It was only after Ferrovial offered Defendant the Superintendent position that Defendant learned he would be responsible for the Northwest Contract and Ferrovial learned that Defendant had previously been responsible for the Central NW Contract.[20] Defendant accepted the position because it paid more than he made with Plaintiff, but had fewer responsibilities.[21]

Defendant did not tell Plaintiff he was going to work for Ferrovial when he resigned from his job with Plaintiff.[22] Instead, Defendant falsely stated he was leaving to start his own tree trimming business.[23] Defendant lied to Plaintiff because he was concerned that Plaintiff would try to enforce an agreement he had signed in February 2018, Confidentiality, Non-Solicitation, and Prohibition on Service Agreement (the "Agreement").[24]

In relevant part, the Agreement prohibited Defendant from (1) possessing or using Plaintiff's confidential information without authorization; (2) soliciting any customers and active potential customers served by the branch of Plaintiff where Defendant worked for 18 months following Defendant's resignation; (3) recruiting

---

[20]     *Id.* at 25:20-27:5.

[21]     *See id.* at 25:6-8.

[22]     April 4, 2020 Letter from Fuentes to Yellowstone [Doc. # 1-5].

[23]     *Id.*

[24]     *Id.*; Agreement [Doc. # 30].

5

any of Plaintiff's employees that Defendant "became aware" of while employed by Plaintiff for 18 months following Defendant's resignation; and (4) working for any customer or active customer prospect with whom Defendant had any contact while employed by Plaintiff for 18 months following Defendant's resignation.[25]

On March 28, 2020, Defendant resigned from his job with Plaintiff.[26] Defendant and began working for Ferrovial the next business day.[27]  Plaintiff learned of Defendant's new job shortly thereafter, and on April 2, 2020, sent Defendant a letter stating that he was in breach of the Agreement.[28]  On April 4, 2020, Defendant responded to Plaintiff's letter, admitting that he was working for Ferrovial but denying that he had violated the Agreement.[29]  Plaintiff also sent a letter to Ferrovial alleging that Defendant was in breach of his obligations under the Agreement.[30]  In

---

[25]     Agreement [Doc. # 30], *passim*.

[26]     Complaint ¶¶ 25-26, Answer ¶¶ 1.25-1.26; Edwards Dep. at 11:19-12:4.

[27]     *Id.*

[28]     April 2, 2020 Letter from Yellowstone to Fuentes [Doc. # 1-3].

[29]     April 4, 2020 Letter from Fuentes to Yellowstone [Doc. # 1-5].

[30]     April 2, 2020 Letter from Yellowstone to Ferrovial [Doc. # 1-4].

6

mid-May, Ferrovial placed Defendant on administrative leave pending resolution of his dispute with Plaintiff.[31]

On May 21, 2020, Plaintiff filed suit against Defendant for breach of contract, misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act and the Federal Defend Trade Secrets Act, computer fraud and abuse in violation of the Computer Fraud and Abuse Act, tortious interference, breach of fiduciary duty, and civil conspiracy.[32]  Plaintiff also filed an emergency motion to enforce the Agreement and to require Defendant to turn over a cell phone and USB drive that Plaintiff alleges Defendant had used to steal trade secrets.[33]  On June 3, 2020, The Court held a non-evidentiary hearing on Plaintiff's emergency motion.[34]  The parties entered into an agreement preserving the *status quo* while Defendant obtained counsel.[35]  Defendant agreed to turn over the questioned devices, agreed not to work

---

[31]   Edwards Dep. at 35:24-36:10; Answer ¶¶ 1.26, 1.35.  Defendant's answer states that he is on unpaid leave.  However, Defendant testified at the evidentiary hearing that Ferrovial is paying his salary while on leave.

[32]   *See* Complaint ¶¶ 36-85.

[33]   Plaintiff's Emergency Motion for Temporary Restraining Order and Incorporated Memorandum in Support [Doc. # 3].

[34]   *See* Transcript of June 3, 2020 Proceedings [Doc. # 13].

[35]   *Id.* at 50:1-52:13.

on Ferrovial jobs with any of Plaintiff's current or former clients, including HCFC, and agreed to refrain from soliciting Plaintiff's customers and employees.[36]

On July 15, 2020, the parties appeared for an initial pretrial conference. The Court set a preliminary injunction hearing ("PI Hearing") for August 3, 2020.[37] The parties were permitted to take limited expedited discovery.[38] Plaintiff and Defendant filed a briefs in support of their  positions on the propriety of a preliminary injunction,[39] and the Court held an evidentiary hearing on August 3, 2020.[40]

## II.   <u>PRELIMINARY INJUNCTION STANDARD</u>

A preliminary injunction "is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 690 (2008); *see also Monroe v. Houston Indep. School Dist.*, 794 F. App'x 381, 384 (5th Cir. 2019).  "The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley Rapides Parish Schl. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). The Fifth Circuit has "frequently cautioned that . . . '[t]he decision to grant a

---

[36]   *Id.*; *see also id.* at 54:2-55:7.

[37]   July 15, 2020 Minute Entry Order [Doc. # 23].

[38]   *Id.*

[39]   Plaintiff's Brief in Support of Preliminary Injunction [Doc. # 27]; Defendant's Preliminary Injunction Brief [Doc. # 28].

[40]   *See* August 3, 2020 Minute Entry Order [Doc. # 35].

8

preliminary injunction is to be treated as the exception rather than the rule.'" *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996) (alteration in original) (quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

To obtain a preliminary injunction, a plaintiff must clearly show (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the Defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

"[The movant] must carry 'a heavy burden of persuading the district court that all four elements are satisfied,' and failure to carry the burden on any one of the four elements will result in the denial of the preliminary injunction." *Leachman v. Harris County, Texas*, 779 F. App'x 234, 237 (5th Cir. 2019) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). A preliminary injunction "should not be granted unless the movant, *by a clear showing*,

9

carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 982 (1997)

(emphasis in original).

## III.   DISCUSSION

Defendant argues that Plaintiff has not met its burden of proof on the first

three elements.  The Court agrees.

### A.   Likelihood of Success on the Merits

 "To show a likelihood of success, the plaintiff must present a prima facie

case, but need not prove that he is entitled to summary judgment."  *Daniels Health*

*Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir.

2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)); *see also*

*Byrum v. Landreth*, 556 F.3d 442, 446 (5th Cir. 2009).

### 1.   Trade Secret Misappropriation Claim

Plaintiff claims that Defendant, before quitting his job with Plaintiff, took

confidential information by emailing to his personal account two proprietary Excel

spreadsheets created by Plaintiff.[41]  Plaintiff uses these spreadsheets to perform two

of the HCFC contracts, one of which Defendant supervised.  The spreadsheets assist

Plaintiff in creating budgets and work schedules for, and monitoring performance

of, the wide area mowing projects for HCFC.  Plaintiff argues that the spreadsheets

---

[41]     *See* 2019 Mechanism Spreadsheet [Doc #30-1]; Man Power Need Spreadsheet
[Doc. # 30-2], received in evidence at the PI Hearing as Exhs. B and C (redacted
PDFs) and as B-1 and C-1 (native format, received under seal).

are confidential trade secrets, and Defendant's misappropriation of them violates the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003(a), and the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

To prove a violation of either statute, Plaintiff must show Defendant knowingly acquired by improper means a "trade secret," defined as "information, including financial data and lists of actual or potential customers or suppliers, that the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means." *Windsor v. Olson*, No. 3:16-CV-934-L, 2019 WL 2080021, at \*18 (N.D. Tex. May 10, 2019) (citing 18 U.S.C. § 1839(3); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6)).

In response, Defendant argues that there is no evidence he misappropriated the spreadsheets, by email or otherwise. Defendant also contends the spreadsheets are not trade secrets because they contain only publicly available information and basic arithmetic calculations and that Plaintiff did not protect the material as confidential.

The Court concludes that Plaintiff has not shown a substantial likelihood of success on the merits of its trade secret misappropriation claims. Crucially, Plaintiff has not introduced any evidence showing that Defendant misappropriated the spreadsheets. Additionally, it is not clear on this record that the spreadsheets, which

11

contain basic formulae to calculate budgets and determine a project's progress, contain or were treated as trade secrets.[42]

## 2.   Breach of Contract Claims

Plaintiff claims that Defendant breached four provisions of the Agreement: (1) Section 2, which prohibits Defendant from disclosing confidential information;[43] (2) Section 3, which prohibits Defendant from soliciting customers and active potential customers of the specific branch of Plaintiff where Defendant worked for 18 months following Defendant's resignation;[44] (3) Section 4, which prohibits

---

[42]   *See* PI Hearing Exhs. B-1 and B-2.

[43]   Section 2 states:

> Employee specifically covenants and agrees . . . Employee will not, both during employment with Yellowstone Landscape or at any time thereafter, . . . disclose, divulge or reveal to any person whomsoever, or use for any purpose other than the exclusive benefit of Yellowstone Landscape any Confidential Information whatsoever, whether contained in the Employee's memory or embodied in writing or other physical form."

Agreement [Doc. # 30] at 3.

[44]   Section 3 states:

> . . . Employee covenants and agrees that . . .for a period of eighteen (18) months following date of termination, whether voluntary or involuntary, Employee will not directly or indirectly solicit, divert, call upon, consult with, advise, or in any way seek to do business with any customer or client serviced by the branch of Yellowstone Landscape in which Employee was employed.  Employee further covenants and agrees that . . .for a period of eighteen (18) months following the date of termination, whether voluntary or involuntary,

Defendant from soliciting Plaintiff's employees that Defendant "became aware" of while employed by Plaintiff for 18 months following Defendant's resignation;[45] and

> he will not directly or indirectly solicit, divert, call upon, consult with, advise, or in any way seek to do business with any active customer prospect of Yellowstone Landscape with whom Employee had contact on behalf of Yellowstone Landscape while employed. Employee further covenants and agrees that . . .for a period of eighteen (18) months following the date of termination, whether voluntary or involuntary, he will not directly or indirectly help, assist, and/or facilitate any third party in its solicitation or pursuit of any past, present, and/or active customer prospect of Yellowstone Landscape with whom the Employee had contact with on behalf of Yellowstone Landscape while employed. . . .
>
> Employee agrees that for purposes of this Non-Solicitation of Customers provision, the term "active customer prospect" shall include all persons and entities of any kind specifically solicited on behalf of Yellowstone Landscape . . . [and] all former customers or clients of Yellowstone Landscape that were customers of Yellowstone Landscape at any time within the one-year period immediately preceding Employee's separation from Yellowstone Landscape. . . .

Id. at 3-4.

[45]    Section 4 states in relevant part:

> Employee covenants and agrees that . . .for a period of eighteen (18) months after termination of such employment (whether such termination is voluntary or involuntary); Employee shall not directly or indirectly, on behalf of Employee or any person or third party, solicit, lure and/or hire any employees of Yellowstone Landscape or any of its affiliates of whom Employee became aware while employed by Yellowstone Landscape or assist or aid in any such activity. Further, Employee covenants and agrees that . . . for a period of eighteen (18) months after termination of such employment (whether such termination is voluntary or involuntary) that he shall not assist or aid any other person or third party in its solicitation or attempted solicitation of any employees of Yellowstone Landscape or any of its

(4) Section 5, which prohibits Defendant from working for Plaintiff's customers or active customer prospects with whom Defendant had any contact with while employed by Plaintiff for 18 months following Defendant's resignation.[46]

### a.      Plaintiff's Claim for Breach of Section 2

Plaintiff has not shown a substantial likelihood of success on its claim for breach of Section 2 for the same reasons it has not shown a substantial likelihood of success on its trade secret misappropriation claims.   Because Plaintiff has not introduced any evidence establishing that Defendant took, much less disclosed or used, any confidential information, Plaintiff has not shown it is substantially likely to prevail on its claim for breach of the Agreement's confidentiality provision.

---

> affiliates of whom Employee became aware of while employed by Yellowstone Landscape.

*Id.* at 4.

[46]      Section 5 states:

> Employee acknowledges and agrees that . . . for a period of eighteen (18) months following the cessation of Employee's employment with Yellowstone Landscape, whether voluntary or involuntary, the employee will not directly or indirectly through another employer or individually, work with or for, consult with or for, advise, aid, or contribute in any way to servicing any customer or active customer prospect with whom employee had any contact or relationship with while employed at Yellowstone Landscape.

*Id.* at 5.

Plaintiff is not entitled to a preliminary injunction for Defendant's alleged breach of Section 2.

### b.      Plaintiff's Claims for Breach of Sections 3 and 4

Plaintiff, for similar reasons, has not shown a substantial likelihood of success on its claims for breach of Sections 3 and 4.  Assuming the clauses on which these claims are based are enforceable,[47] Plaintiff has not shown that Defendant solicited any of its customers or solicited any of its employees.  The evidence shows that Defendant's job duties at Ferrovial are limited to supervising work crews in the field and reporting each crew's daily progress.  Defendant is not involved in Ferrovial's bidding process, does not interact with decision-makers for current or prospective Ferrovial customers, and has not been shown to have recruited employees from Plaintiff to go to work for Ferrovial.  In sum, Plaintiff relies on speculation and general concern about a breach by Defendant in the future.  Because Plaintiff has not presented persuasive evidence that Defendant has clearly violated or is clearly likely to violate in the future the non-solicitation mandates of Sections 3 and 4 of the Agreement, Plaintiff has failed to show a substantial likelihood that it will prevail on the merits of its claims for breach of the Agreement's non-solicitation clauses and is not entitled to a preliminary injunction on this basis.

---

[47]      The Court does not decide at this preliminary stage whether these, or any other provisions in the Agreement, are enforceable as written.

### c.    Plaintiff's Claim for Breach of Section 5

Plaintiff's remaining breach of contract claim is grounded on a non-compete clause, Section 5 of the Agreement.  Non-compete clauses are restraints of trade governed by the Texas Business and Commerce Code.  *See* TEX. BUS. & COM. CODE § 15.50.  "A noncompetition agreement is enforceable if it is reasonable in time, scope and geography and, as a threshold matter, 'if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made.'"  *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) (quoting TEX. BUS. & COM. CODE § 15.50).

Texas courts engage in a two-step inquiry to determine the threshold requirement of whether a non-compete is ancillary to an otherwise enforceable agreement: "First, we determine whether there is an 'otherwise enforceable agreement' between the parties, then we determine whether the covenant is 'ancillary to or part of' that agreement."  *Id.*  Covenants not to compete are considered "ancillary to or part of" another agreement where the consideration given by the employer "is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill."  *Id.* at 775.

Section 5 is part of the February 2018 Agreement between Plaintiff and Defendant.  Defendant was an "at will" employee of Plaintiff.  He had been employed for approximately three years before Plaintiff told Defendant it wanted

16

him to sign the Agreement.  The Agreement states that Defendant's consent was given "[f]or and in consideration of the employment of Employee or the continued employment of Employee in the same or other position, and the salary and other remuneration and benefits paid and to be paid by Yellowstone Landscape to Employee, and for other good and valuable consideration."[48]  While an employer's promise of "continued employment" of an at-will employee like Defendant is illusory and cannot serve as consideration for an employee's agreement to a restrictive covenant, *see Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 534 (5th Cir. 2020); *Eurecat US, Inc. v Marklund*, 527 S.W.3d 367, 389 (Tex. App—Houston [14th Dist.] 2017, no pet.), the Agreement in issue also contains a promise by Plaintiff to give Defendant access to confidential information.[49]  Texas courts have routinely held that similar promises are sufficient consideration and give rise to employers' interest in enforcing non-compete clauses.  *See, e.g.*, *Marsh*, 354 S.W.3d at 775-76; *Alex Sheshunoff Mgmt. Services v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006).

The Court concludes, for preliminary injunction purposes, that Plaintiff has made a *prima facie* showing that Section 5 meets the threshold requirement of being

---

[48]     Agreement [Doc. # 30] at 2.

[49]     *Id.*

"ancillary to or part of an otherwise enforceable agreement." TEX. BUS. & COM. CODE § 15.50(a). The Court need not and does not decide the fact-bound issue of the existence of confidential material to be provided to Defendant that could form the basis of the non-compete bargain.

Even if ancillary to an otherwise enforceable agreement, non-compete clauses are unenforceable if they do not contain reasonable limitations as to time, scope of proscribed conduct, and geographic area. *Marsh*, 354 S.W.2d at 778. The "core inquiry is whether the covenant 'contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" *Sheshunoff*, 209 S.W.3d at 655 (quoting TEX. BUS. & COM. CODE § 15.50(a)). "The hallmark of enforcement is whether or not the covenant is reasonable." *Marsh*, 354 S.W.2d at 777.

Section 5, as written, is extremely broad. It contains no geographical restrictions or boundaries to the scope of proscribed conduct.[50] Section 5 prohibits

---

[50] *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable . . ."); *Gomez v. Zamora*, 814 S.W.2d 114, 118 (Tex. App.—Corpus Christi 1991, no writ) ("Indefinite descriptions of the area covered by a non-competition covenant render them unenforceable as written."); *see also Dale v. Hoschar*, No. 05–13–01135–CV, 2014 WL 3907997, at *2 (Tex. App.—Dallas 2014, no pet.) ("a covenant not to compete that has no limitations concerning geographical area or scope of activity is an unreasonable restraint of trade and unenforceable.").

Defendant from working with, advising aiding or contributing in any way to servicing "any customer or active customer prospect with whom employee had any contact or relationship" while employed by Plaintiff.  The clause purports to cover all types of services, not limited to the work Defendant performed, namely, wide area mowing, or even routine commercial landscaping services that Plaintiff provided its customers.  *U.S. Risk Ins. Grp. Inc. v. Woods*, 399 S.W.3d 295, 301 (Tex. App.—Dallas 2013, no pet.) (finding that covenant not to compete was unenforceable because the scope of proscribed conduct was "not limited to the type of business that [employee] performed for [employer].").

If a restrictive covenant is found to be unreasonable, Texas law directs the Court to reform the covenant "to the extent necessary to cause the limitations contained in the covenant . . . to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee . . . ." TEX. BUS. & COM. CODE § 15.51(c).  Courts are divided on whether the availability of reformation is a factor to be considered at the preliminary injunction stage in connection with determining whether a plaintiff has a substantial likelihood of success in enforcing an otherwise overbroad restrictive covenant.[51]

---

[51]     *Compare Gray Wireline Serv., Inc. v. Cavanna*, 374 S.W.3d 464, 470 (Tex. App.—Waco 2011, no pet.) ("reformation . . . is a remedy to be granted at a final hearing, whether on the merits or by summary judgment, not as interim relief.") and *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 238-39 (Tex. App.—

Although it is apparent that, by working with Ferrovial to perform a contract for HCFC, Defendant has run afoul of Section 5's non-compete prohibition as written, it is also apparent that the clause is overbroad in certain respects. The Court, however, at this preliminary stage need not reach the question of whether Section 5's overbreadth makes it unenforceable in its entirety or whether it can and should be enforced as reformed. As explained below, even if Section 5 were reformed, a preliminary injunction is not warranted because Plaintiff has failed to meet its high burden to satisfy the other elements of proof necessary for the extraordinary relief of a preliminary injunction.

### B.    Substantial Likelihood of Immediate and Irreparable Harm

Plaintiff must show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. "To establish a threat of irreparable harm,

---

Houston [14th Dist.] 2003, no pet.) ("Reformation is generally a final remedy. More importantly, [TEX. BUS. & COM. CODE § 15.51(c)] also provides that, after a trial court reforms a non-competition covenant to make it reasonable, the court cannot then award the promisor damages based on the promisee's breach, but is limited to enforcing the newly reformed covenant by injunction. . . . This language clearly refers to a final remedy."), *with Justin Belt Co., Inc. v. Yost*, 502 S.W.2d 681, 685 (Tex. 1973) (affirming trial court's reformation of noncompete in granting temporary injunction); *Accurent, LLC v. Short*, No. 1:17–CV–858–RP, at *3 (W.D. Tex. Jan. 4, 2018) ("A court may reform an unreasonable covenant for the purpose of entering a preliminary injunction."); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 857-58 (W.D. Tex. 2016) (reforming a non-compete covenant while granting a preliminary injunction); *Tranter, Inc. v. Liss*, No. 02–13–00167–CV, 2014 WL 1257278, at *10 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) ("[R]eformation is not only a final remedy").

[movant] must show 'a significant threat of injury from the pending action, that the injury is imminent, and that money damages would not fully repair the harm.'" *Doucette v. Ditech Financial LLC*, 2019 WL 4934857, at *3 (E.D. Tex. Aug. 30, 2019) (quoting *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)).   "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."   *Winter*, 555 U.S. at 22 (alteration in original) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2013)).

The Court is unpersuaded that Plaintiff is likely to suffer immediate and irreparable harm from Defendant's employment with Ferrovial.   Plaintiff's fundamental position is that Defendant's experience and knowledge will assist Ferrovial in winning future HCFC wide area mowing contracts over Plaintiff. Plaintiff's concerns are speculative at this time.   Plaintiff has not shown that Defendant was involved in the 2019 HCFC bidding process while working for Plaintiff or that he is now or likely to be involved in that process for Ferrovial going forward.   There is no evidence that Defendant is in contact or has relationships with anyone at HCFC in a decision-making capacity for new contracts.   The inspectors with whom Defendant interfaces on the job have not been shown to have any involvement in the contracting process for new work.   There also is no way to know at this time if Plaintiff's bid on another contract will be financially competitive.

There is no evidence that Defendant is in possession of any confidential information, that Defendant likely will solicit Plaintiff's clients and prospective clients (or has access to decision-makers who would put him in a position to do so), or that Defendant has any incentive to, or is likely to, recruit Plaintiff's employees. Further, there is no evidence in the record about timing on additional HCFC wide area mowing contracts coming up for bid.

Even if Plaintiff did lose another HCFC contract to Ferrovial as a result of Defendant's breach of an enforceable restriction in the Agreement, the harm may be able to be remedied with money damages.[52]   Solicitations for bids and bids

---

[52]   The Agreement states "any breach of this Agreement or any paragraph hereof will result in irreparable and continuing harm to Yellowstone Landscape for which money damages may not provide adequate relief."  Agreement at 6.  It is a fact question when this provision applies.  In any event, "[c]ontractual stipulations of 'irreparable harm' . . . are insufficient by themselves to support a finding of irreparable harm to support injunctive relief." *Traders Int'l, Ltd. v. Scheuermann*, No. H-06-1632, 2006 WL 2521336, *8 (S.D. Tex. Aug. 30, 2006) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief.")).  *See also Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*, 2012 WL 1344352, at *4 (N.D. Tex. Apr. 18, 2012) (stating that a stipulation "is merely one factor to be examined in making the irreparable harm determination"); *Smith, Bucklin & Assocs., Inc v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop."); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("We also agree with the district court that the contractual language declaring money damages

themselves for HCFC wide area mowing contracts are public information.  Plaintiff now knows how much Ferrovial bid for the Central Northwest Contract, and can ascertain the bids for any other contracts with the County.  Plaintiff has not shown that it will suffer immediate and irreparable harm if the Court denies the requested preliminary injunction.

### C.    Balancing of Hardships

"A preliminary injunction is to be issued only when the balance of hardships favors the party seeking the injunction.  This calculation requires a court to consider the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief.  A district court therefore can only perform this task after identifying the most serious possible injury that can be claimed by either party."  *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336-37 (5th Cir. 2013).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

The Court is unpersuaded that the threatened injury to Plaintiff from denial of a preliminary injunction outweighs the likely damage that the requested injunction would cause Defendant.  Plaintiff is a large commercial landscaping company with

---

inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate.").

offices in eight states.[53]  Plaintiff is the fifth-largest landscaping firm in the nation, with over $200 million in annual revenue.[54]  It has not been shown that Defendant's work for Ferrovial would cause Ferrovial to win future HCFC contracts at Plaintiff's expense.

On the other hand, Defendant earns approximately $70,000 per year and supports a family of five.  Defendant will lose his job and be out of work in the middle of a pandemic if an injunction is granted because the two HCFC contracts in issue are the only work Defendant's new employer, Ferrovial, currently has in the Houston area.  Defendant and his family would suffer significant hardship if he were unemployed, particularly under present circumstances.  He pays for his eldest child's college tuition, and Defendant's wife is in need of surgery for a herniated disc in her spine.[55]

The Court has seen no indication that Defendant intended to violate the Agreement as he understood it.  He has not been shown to have violated his confidentiality and non-solicitation obligations but, prophylactically, the Court has emphasized to Defendant the importance of his complying with the provisions of the

---

[53]   *History*, Yellowstone Landscape, http://www.yellowstonelandscape.com/about/history.html (last visited Aug. 4, 2020).

[54]   *LM150: 2019 Rankings*, Landscape Management (June 26, 2019 https://www.landscapemanagement.net/lm150-2019-rankings/.

[55]   Defendant's counsel have rendered their services *pro bono*.

Agreement until there are definitive rulings on enforceability. More specifically, the Court warned Defendant not to solicit Plaintiff's employees, not to solicit new business from HCFC or any of Plaintiff's customers, and not to divulge any of Plaintiff's confidential information to anyone. The Court also explained to Defendant that he should not assist Ferrovial on the Central NW Contract, the contract he worked on for Plaintiff.

The loss of an HCFC contract is a relatively small portion of Plaintiff's corporate revenue. The Court concludes that the threat of irreparable injury to Plaintiff is not substantial, while the damage that the requested injunction likely would cause Defendant is enormous.

## IV.    **CONCLUSION AND ORDER**

The Court concludes that Plaintiff has not met its burden to show it is clearly entitled to a preliminary injunction. It is therefore

**ORDERED** that Plaintiff's Request for Preliminary Injunction [Doc. # 27] is **DENIED**.

SIGNED at Houston, Texas, this 6th day of **August, 2020.**

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE